J-S10009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MIZZON UNIQUE GRANDINETTI | : | |
| | : | |
| Appellant | : | No. 512 WDA 2023 |

Appeal from the Judgment of Sentence Entered August 9, 2022
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0000135-2021

BEFORE: OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY OLSON, J.: **FILED: June 18, 2024**

Appellant, Mizzon Unique Grandinetti, appeals from the judgment of sentence entered August 9, 2022, as made final by the denial of his post-sentence motion on March 23, 2023. We affirm.

"This case arises out of the homicide of Barron Grumbling that occurred in Johnstown[,] Pennsylvania on or about May 1, 2017." Trial Court Opinion, 3/29/23, at 1. On February 24, 2021, Appellant was charged in relation to Grumbling's death. "A jury trial [proceeded from January 25, 2022 until January 29, 2022]" but resulted in a mistrial. **Id.** "Following certain pre-trial conferences, a second jury trial was held on June 8, 2022 [through] June 10, 2022." **Id.** On June 10, 2022, the jury found Appellant guilty of first-degree

murder.[1]  On August 9, 2023, the trial court sentenced Appellant to life imprisonment without the possibility of parole.[2]  This timely appeal followed.[3]

_____

[1] 18 Pa.C.S.A. § 2502(a).

[2] At the time of the offense, Appellant was 16-years-old.   As such, Appellant met the criteria of a juvenile homicide offender whose sentence for first-degree murder is fixed by 18 Pa.C.S.A. § 1102.1, which directs the trial court to exercise its discretion pursuant to certain statutory factors in imposing a sentence where the minimum punishment starts at 35 years and extends to life without the possibility of parole.

[3] On August 10, 2022, trial counsel filed a motion to withdraw as counsel.  In his motion, trial counsel indicated that he was only retained for trial but that Appellant wished to file an appeal and could not afford privately-retained appellate counsel.  As such, trial counsel requested leave to withdraw and asked the trial court to appoint appellate counsel.  On August 15, 2022, the trial court granted trial counsel leave to withdraw and appointed Andrew Skala, Esquire, as appellate counsel.  That same day, the trial court *sua sponte* granted Appellant a 21-day extension to file a post-sentence motion.  On August 26, 2022, Attorney Skala filed a motion to withdraw as counsel, citing a conflict of interest.  Thus, that day, the trial court granted Attorney Skala leave to withdraw, appointed Christy Foreman, Esquire as substitute counsel, and issued, *sua sponte*, a 30-day extension for Appellant to file a post-sentence motion.  On September 19, 2022, Attorney Foreman requested an extension of time to file a post-sentence motion, which the trial court granted on September 21, 2022.  In particular, the trial court directed Attorney Foreman to file a post-sentence motion on Appellant's behalf on or before October 25, 2022.  Appellant, through Attorney Foreman, filed a post-sentence motion on October 24, 2022, as well as a motion for leave to file an amended post-sentence motion *nunc pro tunc*.  On October 27, 2022, the trial court granted Appellant leave to file an amended post-sentence motion *nunc pro tunc*.  Appellant filed an amended post-sentence motion *nunc pro tunc*, as permitted by the trial court, on November 23, 2022.  The trial court then scheduled a hearing on Appellant's post-sentence motion.  In recognition of the fact that the trial court scheduled the hearing on Appellant's post-sentence motion after 120 days of its filing, which would result in Appellant's post-sentence motion being denied by operation of law before the hearing took place, Appellant filed a 30-day extension request, seeking to extend the time that the trial court had to decide the post-sentence motion pursuant to
*(Footnote Continued Next Page)*

_____

Pa.R.Crim.P. 720(B)(3)(b). The trial court granted Appellant's request and, as such, extended the time for deciding Appellant's post-sentence motion to March 23, 2023. Ultimately, on March 29, 2023, the trial court issued an order denying Appellant's post-sentence motion. A notice of appeal was then filed on April 17, 2023.

A notice of appeal must be filed within 30 days of the entry of the challenged order. *See* Pa.R.A.P. 903(a). If a timely post-sentence motion is filed, an appeal must be taken within 30 days of the entry of the order deciding the motion. *See* Pa.R.Crim.P. 720(A)(2)(a). If made within 10 days of the issuance of a judgment of sentence, a request for an extension of time to file a post-sentence motion may toll the appeal period. *See Commonwealth v. Horst*, 481 A.2d 677 (Pa. Super. 1984). In general, a trial court only has 120 days to decide a post-sentence motion and, if it fails to decide a motion within that time, the post-sentence motion is denied by operation of law. *See* Pa.R.Crim.P. 720(B)(3)(a). If a post-sentence motion is denied by operation of law, the clerk of courts must enter an order deeming the motion denied on behalf of the trial court and serve copies on the parties. *See* Pa.R.Crim.P. 720(B)(3)(c). Upon request, however, a trial court may, "for good cause shown," grant one 30-day extension of the 120-day decision period. *See* Pa.R.Crim.P. 720(B)(3)(b).

Herein, the trial court *sua sponte* granted an extension request on August 15, 2022, which was within 10 days of Appellant's judgment of sentence. Because the subsequent extension requests were granted within the extended filing periods, we conclude that Appellant's post-sentence motion, filed on October 24, 2022, was timely filed. In addition, we conclude that, because Appellant's counsel made a timely request under Pa.R.Crim.P. 720(b)(3)(a) for an extra 30 days of time to decide Appellant's motion, and the trial court properly granted Appellant's request, the trial court was permitted to issue a ruling on Appellant's post-sentence motion within 150 days of its filing, *i.e.*, on or before March 23, 2023. In this instance, however, the trial court did not issue its order denying Appellant's post-sentence motion until March 29, 2023 and, as such, the motion was still denied by operation of law on March 23, 2023. A review of the record, however, reveals that the clerk of courts failed to enter an order deeming Appellant's post-sentence motion denied by operation of law. In addition, it is apparent that, despite the clerk's failure, Appellant filed a timely notice of appeal on April 17, 2023. Based upon the foregoing, we conclude that Appellant's appeal is timely and will address the merits of his claims.

Appellant raises the following issues on appeal:[4]

1. [Whether the] trial court erred in denying Appellant's motion for reconsideration of sentence [when] the court failed to adequately consider the mitigating factors when imposing the sentence of life imprisonment in this matter and improperly relied on evidence related to other potential homicides?

2. [Whether the] trial court erred in denying Appellant's motion for judgment of acquittal as Appellant is innocent and the evidence in this matter was insufficient to sustain Appellant's conviction for [criminal homicide?]

3. [Whether the] trial court erred in denying Appellant's motion for a new trial as the verdict was against the weight of the evidence[?]

4. [Whether the] trial court erred in permitting multiple "affiant" law enforcement officers to remain in the [courtroom] in violation of the sequestration order, thereby tainting their testimony in violation of [] Appellant's constitutional rights, thus warranting [a new trial?]

5. [Whether the] trial court erred in not granting the jury's request during deliberations to review the [tape-recorded] interview of witness [Daekwon] Coleman, which had been entered into evidence, thus warranting the grant of a new trial[?]

6. [Whether the] trial court erred in permitting Detective [Mark] Britton to testify at trial regarding the conclusions of the forensic evidence when he was not qualified as an expert in the field of forensics, and such error warrants the grant of a new trial[?]

7. [Whether the] trial court erred in permitting Detective Britton to testify at trial regarding [Daekwon] Coleman's credibility when [the court] failed to give a limiting instruction to the jury after [the detective's] credibility statement was entered on the record before the jury, and such error warrants the grant of a new trial[?]

_____

[4] We have reordered Appellant's issues for ease of discussion and disposition.

8. [Whether the] trial court erred in failing to give a No Adverse Inference Jury Instruction during its final instructions to the jury in violation of Appellant's constitutional rights thus warranting the grant of a new trial[?]

9. [Whether the] trial court erred in failing to conduct a colloquy with [Appellant] regarding his decision to testify and call character witnesses, thus warranting the grant of a new trial[?]

Appellant's Brief at 7-8 (unnecessary capitalization omitted) (cleaned-up).

In his first issue, Appellant raises a challenge to the discretionary aspects of his sentence.

This Court previously explained:

It is well-settled that "the right to appeal a discretionary aspect of sentence is not absolute." **Commonwealth v. Dunphy**, 20 A.3d 1215, 1220 (Pa. Super. 2011). Rather, where an appellant challenges the discretionary aspects of a sentence, we should regard his[, or her,] appeal as a petition for allowance of appeal. **Commonwealth v. W.H.M.**, 932 A.2d 155, 162 (Pa. Super. 2007). As we stated in **Commonwealth v. Moury**, 992 A.2d 162 (Pa. Super. 2010):

An appellant challenging the discretionary aspects of his[, or her,] sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether appellant [] filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, [**see**] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

[**Moury**, 992 A.2d] at 170 [(citation omitted)].

- 5 -

*Commonwealth v. Hill*, 210 A.3d 1104, 1116 (Pa. Super. 2019) (original brackets omitted).

Herein, Appellant filed a timely notice of appeal, preserved his sentencing challenge in his post-sentence motion, and included a Rule 2119(f) concise statement in his appellate brief. **See** Appellant's Brief at 28-30. Thus, we turn to whether Appellant raised a substantial question. A substantial question exists when an appellant presents a colorable argument that the sentence imposed is either (1) "inconsistent with a specific provision of the [s]entencing [c]ode" or (2) is "contrary to the fundamental norms which underlie the sentencing process." **Commonwealth v. Mastromarino**, 2 A.3d 581, 585 (Pa. Super. 2010) (citation omitted), *appeal denied*, 14 A.3d 825 (Pa. 2011). This Court will not look beyond the statement of questions involved and the prefatory Rule 2119(f) statement to determine whether a substantial question exists. **Commonwealth v. Radecki**, 180 A.3d 441, 468 (Pa. Super. 2018) (citation omitted). Moreover, for purposes of determining what constitutes a substantial question, "we do not accept bald assertions of sentencing errors," but rather require an appellant to "articulat[e] the way in which the court's actions violated [sentencing norms or] the sentencing code." **Commonwealth v. Malovich**, 903 A.2d 1247, 1252 (Pa. 2006).

In Appellant's 2119(f) statement, he contends that the trial court abused its discretion by imposing a sentence of life without the possibility of parole. In particular, Appellant claims that, in so doing, the trial court overly relied upon improper factors and failed to consider important mitigating factors.

Both of Appellant's claims raise a substantial question, warranting review. *See Commonwealth v. Schroat*, 272 A.3d 523, 527 (Pa. Super. 2022) (juvenile homicide defendant raised substantial question in alleging that trial court failed to consider relevant mitigating factors when imposing life without possibility of parole); *see also Commonwealth v. Seagraves*, 103 A.3d 839, 842 (Pa. Super. 2014) (holding that the appellant's claim that the "trial court improperly relied on factors derived from a prior decertification hearing" raised a substantial question). Because Appellant raises a substantial question, we shall proceed to the merits of his discretionary sentencing challenge.

Appellant argues that the trial court, in fashioning his sentence, improperly relied upon unsubstantiated and uncharged offenses, as well as hearsay statements pertaining to other homicides that were never subjected to cross-examination. *See* Appellant's Brief at 33-34. In addition, Appellant claims that the trial court failed to consider other mitigating factors such as his good behavior while incarcerated, the fact that he "was a child born in prison," spent "most of his childhood in and out of the [Office of Children, Youth and Families] system," and was a "victim of neglect with no father and a mother routinely incarcerated." *Id.* at 36-37.

With respect to our standard of review, we have held that "sentencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion."

- 7 -

***Commonwealth v. Ritchey***, 779 A.2d 1183, 1185 (Pa. Super. 2001). This

Court has held:

> [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, our Court [has explained]: An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.
>
> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

***Moury***, 992 A.2d at 169–170 (internal citation and brackets omitted).

In fashioning a sentencing scheme for a juvenile homicide offender, our

Supreme Court instructed trial courts to consider the sentencing requirements

codified in 18 Pa.C.S.A. § 1102.1. Subsection 1102.1 provides, in relevant

part, as follows.

> (a) **First degree murder.**--A person who has been convicted after June 24, 2012, of a murder of the first degree, first degree murder of an unborn child or murder of a law enforcement officer of the first degree and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:
>
> > (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.

(2) A person who at the time of the commission of the offense was under 15 years of age shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 25 years to life.

(b) **Notice.**--Reasonable notice to the defendant of the Commonwealth's intention to seek a sentence of life imprisonment without parole under subsection (a) shall be provided after conviction and before sentencing.

\*\*\*

(d) **Findings.**--In determining whether to impose a sentence of life without parole under subsection (a), the court shall consider and make findings on the record regarding the following:

(1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. A victim impact statement may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual posed by the defendant.

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the defendant.

(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

(vi) Probation or institutional reports.

(vii) Other relevant factors.

18 Pa.C.S.A. § 1102.1(a)(b) and (d).

Importantly, it is well-settled that "[a] sentencing court may consider any legal factor" while making its determination of the sentence to be imposed. *Commonwealth v. Bowen*, 975 A.2d 1120, 1122 (Pa. Super. 2009) (citation omitted). Moreover, we previously determined:

In deciding whether a trial judge considered only permissible factors in sentencing a defendant, an appellate court must, of necessity, review all of the judge's comments. Moreover, in making this determination it is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it reasonably appears from the record that the trial court relied in whole or in part upon such a factor.

*Commonwealth v. Scott*, 860 A.2d 1029, 1030 (Pa. Super. 2004) (internal quotations and citations omitted). "[W]here the sentencing judge had the benefit of a pre-sentence investigation report ("PSI"), it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Clemat*, 218 A.3d 944, 960 (Pa. Super. 2019).

Our review of the sentencing transcript reveals no abuse of discretion on the part of the trial court. First, it is apparent that, in fashioning Appellant's sentence, the trial court painstakingly considered each of the seven factors

listed in Subsection 1102.1(d).  *See* N.T. Sentencing Hearing, 8/9/22, at 41-49.  In its 1925(a) opinion, the trial court summarized its consideration of Subsection 1102.1(d)'s factors as follows:

> At the time of sentencing, this [c]ourt explored the seven factors found in 18 Pa.C.S.A. § 1102.1(d) on the record.  As to the first factor, this [c]ourt considered both the statements made by the family of [Barron] Grumbling, as well as those made by [Appellant's] family.  Specifically, this [c]ourt referenced the sense of loss from [Barron] Grumbling's family, stating "from listening to these people, they [are] crushed."  As to the second factor, impact on the community, this [c]ourt referenced [that] the shooting occurred on the street.  While no eyewitnesses of the shooting itself, several people heard it and were looking out of windows within seconds.  This [c]ourt further emphasized that this was, for a time, one of several unsolved murders of young people in the City of Johnstown.  While [Appellant] was in prison on other charges subsequent to the murder, no arrests were made on this homicide for years.  The [e]ffect on the community "was that they were concerned, in fact, probably were in fear, of not knowing if the perpetrator was still at large." This [c]ourt next considered the threat to the safety of the public or any individual.  This [c]ourt found that[,] not only would the public at large have to fear [Appellant], but this [c]ourt had specific concern for two individuals, specifically[,] Daekwon Coleman and Alonya Chatman.  A brief portion of a letter from [Alonya] Chatman was read into the record were [she] expressed fear for her life due to her testimony in this matter.  Factors four and five pertain to the nature of the offense and [Appellant's] culpability.  This [c]ourt found that Barron Grumbling was shot three times, and there was testimony that [Appellant] killed him and did so in an intentional way.  The sixth factor calls for the guidelines for sentencing as adopted by the Pennsylvania Commission on Sentencing.  Specifically, the standard range was 438 months to life and the mitigated range 420 months.
>
> Finally, this [c]ourt considered factors and characteristics related to the age of [Appellant].  This court considered the mental capacity of [Appellant], namely a lack of medical restrictions or evidence of any neuropsychological deficits.  As well, this [c]ourt noted that [Appellant] appeared mature

beyond his stated years from the [c]ourt's personal observations. As to the degree of criminal sophistication, this [c]ourt noted [Appellant's] ability to avoid apprehension for [three] years as well as the fact that this was a planned murder by [Appellant]. The nature and extent of prior delinquent or criminal history was also considered. Briefly, this included a juvenile record beginning when [Appellant] was nine years old with an offense pertaining to possession of a BB gun. On the record, this [c]ourt reviewed [Appellant's] extensive, escalating criminal history.

Trial Court Opinion, 3/29/23, at 4-5 (internal citations omitted).

Second, a review of the record indicates that, in contrast to Appellant's claims, the trial court considered Appellant's troubled upbringing as well as his behavior while incarcerated as mitigating factors. Indeed, the trial court specifically stated:

And I did consider mitigating factors. I considered the testimony of [the] folks that came forward, the relatives. I looked at the PSI, and I considered that. So appropriately brought out by [counsel, Appellant] did not have a childhood like he had, that I had, that [the District Attorney] had. Now, does that excuse what he did?

I also considered in his favor the fact that while incarcerated, [Appellant] has completed a batterers group, did that on November [2, 2021]; and violence prevention and modern intensity program on February [23, 2022]. So when you look at how he grew up, what chance he had, and the fact that he did, once in jail for an extended sentence as an adult prior to being arrested on these charges, he did make some attempts and I give him credit for that. However, that does not outweigh the whole history of [Appellant] from the time he was nine years old.

N.T. Sentencing Hearing, 8/9/22, at 47-48.

Finally, a review of the record as well as the trial court's 1925(a) opinion confirms that the trial court considered allegations that, in addition to the

killing of Barron Grumbling, Appellant allegedly committed "two other homicides for which he has not been arrested." *Id.* at 5; *see also* N.T. Sentencing, 8/9/23, at 48. This information was provided to the court by the Commonwealth. In particular, the Commonwealth submitted as an exhibit Alonya Chatman's testimony at another jury trial, wherein she stated that Appellant confessed to murdering a woman because he believed she was a "snitch." *Id.* at 6 (Commonwealth's Exhibit 3). In addition, the Commonwealth submitted as an exhibit Alonya Chatman's grand jury testimony, wherein she claimed she witnessed Appellant murder another individual. *Id.* (Commonwealth's Exhibit 4). Importantly, the trial court was permitted to consider such evidence. *Bowen*, 975 A.2d at 1122 (explaining that a court may consider "any legal factor" while making its determination of the sentence to be imposed). Our review confirms that, in contrast to Appellant's claims, the trial court did not significantly rely on the aforementioned allegations while imposing his sentence. Instead, "the allegations were taken in concert with the rest of [Appellant's] history and factors in order to better understand his background, conduct, and the circumstances effecting his behavior." Trial Court Opinion, 3/29/23, at 5 (citation omitted). Because the trial court simply considered these allegations in conjunction with the PSI report, as well as each of the seven factors listed in Subsection 1102.1(d), it cannot be said to have committed an abuse of discretion.

Based on the totality of the circumstances, and because Appellant's sentence complies with subsection 1102.1(a) and the precedents of our Supreme Court, we find no grounds on which to award relief to Appellant.

In his second issue, Appellant contends that the Commonwealth failed to present sufficient evidence to support his conviction for first-degree murder. In particular, Appellant claims the Commonwealth failed to demonstrate that he, in fact, killed Barron Grumbling. We disagree.

Our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth may not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014–1015 (Pa. Super. 2002) (internal citations and quotation omitted).

Our Supreme Court previously explained:

- 14 -

> Evidence is sufficient to sustain a conviction of first-degree murder when the Commonwealth establishes that (1) a person was unlawfully killed; (2) the person accused did the killing; and (3) the accused acted with specific intent to kill. An intentional killing is one committed by means of poison, lying in wait, or by any other kind of willful, deliberate, and premeditated action. The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill.

*Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007) (internal citations omitted).

The trial court herein addressed Appellant's claim as follows.

> Bearing [the aforementioned] standards in mind, th[e court is satisfied that the evidence presented at trial, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain [Appellant's] conviction of first-degree murder. Turning to the specific elements of the evidence, there can be no question that the first element was met. Barron Grumbling was killed by gunshot wounds to the head and chest. In fact, [Appellant] stipulated that Barron Grumbling was killed and the manner of death was homicide. [Appellant] primarily contests the second element of first[-]degree murder, that he was responsible for the death of Barron Grumbling.
>
> The evidence at trial included numerous lay witnesses that were at or near the area of the murder the night of May 1, 2017. One such witness, Constance Kralik, testified that she heard multiple gun shots and observed two young black males wearing dark red hooded sweatshirts. She also testified that one individual was noticeably shorter than the other. The jury further heard from Daekwon Coleman, a friend of [Appellant]. [] Coleman testified as to the history between different groups living in the Johnstown area, and how these groups interacted with each other. Specifically, the individuals living in Prospect, such as [Appellant], or Coopersdale, as Barron Grumbling [did], sometimes "did [not] get along very well." [In addition], Coleman testified that Coopersdale [sic] had robbed [Appellant's] cousin, "Baby Sheik." … Coleman further testified that he was in fact present with [Appellant] the night of the murder. [] Coleman testified that he, [Appellant], and Barron

- 15 -

Grumbling were walking together when [Appellant] stopped, saying he had to tie his shoe. [] Coleman then testified that he heard a gunshot, and turned to see [Appellant] holding a gun, and watched him shoot Barron Grumbling twice. Per [] Coleman, he and [Appellant] then ran away in the same direction. It is important to note that Daekwon Coleman is 5'10" tall and [Appellant] is 5'5", which corroborates the testimony of Constance Kralick. Finally, the Commonwealth called Alonya Chatman, [Appellant's] ex-girlfriend. [] Chatman testified that [Appellant] in fact confessed to her that []he shot "B.G.", which was a nickname that Barron Grumbling went by.

As to the third element, whether [Appellant] acted with the specific intent to kill, th[e court] takes note of the fact that specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the body. In this particular case, the evidence showed that Barron Grumbling died of gunshot wounds to the chest and head. Both the chest and head are vital areas of the body and a gun is a deadly weapon. Using those pieces of evidence, the specific intent to kill may be inferred.

Taking all of the evidence in the light most favorable to the Commonwealth, th[e court] finds the evidence submitted by the Commonwealth is sufficient to sustain a conviction for first-degree murder.

Trial Court Opinion, 3/29/23, at 7-8 (internal citations omitted). We adopt this aspect of the trial court reasoning as our own. As such, we conclude that the Commonwealth presented sufficient evidence to sustain Appellant's conviction for first-degree murder.

In his third issue, Appellant clams that the verdict was against the weight of the evidence. Appellant challenges the credibility of the testimony, namely, that of Daekwon Coleman and Alonya Chatman, and other evidence proffered by the Commonwealth to support its contention that Appellant murdered Barron Grumbling. When considering a challenge to the weight of

the evidence offered in support of a criminal conviction, our standard of review is well settled.

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa. Super. 2017) (quotations omitted), *appeal denied*, 171 A.3d 1286 (Pa. 2017). "To successfully challenge the weight of the evidence, a defendant must prove the evidence is 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" *Id.* (citations and internal quotations omitted).

The entirety of Appellant's argument challenges the credibility of the Commonwealth's witnesses' testimony. We conclude that the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. The jury heard the evidence introduced at trial and was free to

determine the weight of the evidence and testimony. It is the fact-finder's duty to assess credibility and we may not substitute our judgment for the jury's findings. Moreover, the evidence was not so tenuous, vague and uncertain that the verdict shocked the conscious of the court. Accordingly, Appellant's weight of the evidence claim fails.

In his fourth issue, Appellant argues that the trial court committed an error of law by allowing multiple law enforcement officers to remain in the courtroom at counsel's table for the duration of Appellant's trial. More specifically, Appellant claims that, because the trial court allowed Detective Britton, Agent Ryan Caputo and Agent Moore[5] to remain in the courtroom, they all heard each other's evidence, which "tainted their testimony" to Appellant's "detriment." Appellant's Brief at 44-45. We disagree.

We previously explained:

> This Court's standard of review for a trial court's decision on sequestration of witnesses is abuse of discretion. ***Commonwealth v. Atwell***, 785 A.2d 123, 125 (Pa. Super. 2001). We will not reverse a trial judge's decision to grant or deny sequestration absent a clear abuse of discretion. ***Commonwealth v. Pursell***, 724 A.2d 293, 310 (Pa. 1999). Moreover, an appellant must demonstrate that he or she was actually prejudiced by a trial judge's sequestration order before any relief may be warranted. ***See id.*** at 310 (holding that an appellant's failure to show prejudice rendered meritless his ineffectiveness claim against counsel who failed to object to the presence of a police witness after trial court ordered a sequestration of witnesses); ***Commonwealth v. Albrecht***, 511 A.2d 764, 773 (Pa. 1986) (holding that an appellant's failure to show prejudice rendered meritless his argument that

---

[5] Agent Moore's first name is not of record.

the trial court erred by not sequestering a Commonwealth expert witness). "[A] request for sequestration must be specific and supported by a showing that the interests of justice require it. The purpose of sequestration is to prevent a witness from molding his testimony with that presented by other witnesses." ***Commonwealth v. Counterman***, 719 A.2d 284, 299 (Pa. 1998) (citation omitted).

Further, Rule 615 of the Pennsylvania Rules of Evidence provides:

> At the request of a party or on its own motion, the court may order witnesses sequestered so that they cannot learn of the testimony of other witnesses. This section does not authorize sequestration of the following:
>
> > (1) a party who is a natural person or the guardian of a party who is a minor or an incapacitated person;
> >
> > (2) an officer or employee of a party which is not a natural person (including the Commonwealth) designated as its representative by its attorney; or
> >
> > (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Pa.R.E. 615.

> The Comment to Rule 615 explains that the parenthetical phrase relating to "the Commonwealth" in subsection (2) "is meant to make clear that in a criminal case, the prosecution has a right to have the law enforcement agent primarily responsible for investigating the case at the counsel table to assist in presenting the case, even though the agent will be a witness." ***Id.***, cmt. (1998).

***Commonwealth v. Stevenson***, 894 A.2d 759, 767 (Pa. Super. 2006) (parallel citations omitted), *overruled on other grounds by **Commonwealth v. Hicks***, 208 A.3d 916 (Pa. 2019).

Upon review, we conclude that Appellant's claim fails – and does so for two reasons. First, Detective Britton, Agent Caputo and Agent Moore were

- 19 -

noted by the Commonwealth as the "affiants," who were "involved in the investigation together" and, as such, were assisting the Commonwealth in its presentation of the case. N.T. Trial, 6/8/22, at 35. Hence, pursuant to Pa.R.E. 615, all three were permitted to be "at the counsel table to assist in presenting the case," even if they were also witnesses during the trial. Pa.R.E. 615, cmt. Second, Appellant utterly fails to demonstrate that the trial court's ruling resulted in prejudice. On appeal, Appellant asserts that permitting the officers to "remain in the courtroom through[out] the entire proceedings would have tainted their testimony to the detriment of Appellant." Appellant's Brief at 45. Not only is Appellant's claim nothing more than a bald assertion, it is also belied by the record. Indeed, as noted by the trial court, "only two of the non-sequestered witnesses/affiants testified at trial," namely, Detective Britton and Agent Caputo. Trial Court Opinion, 3/29/23, at 11. Detective Britton testified first and "focused on the investigative steps taken by police." *Id*. Agent Caputo, on the other hand, "focused primarily on the [tele]phone records seized in the case." *Id*. The officers' testimony, therefore, did not overlap and, in turn, cannot be considered "tainted" to Appellant's detriment. Based upon the foregoing, we conclude that Appellant's claim lacks merit.

In his fifth issue, Appellant contends that the trial court abused its discretion in denying the jury's request, during deliberations, to review Daekwon Coleman's tape-recorded interview with police. We disagree.

This Court explained:

> Pursuant to Pennsylvania Rule of Criminal Procedure 646, "[u]pon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C) [delineating which materials the jury shall not be permitted to have]." Pa.R.Crim.P. 646. "The recognized reason for excluding certain items from the jury's deliberations is to prevent the jury from placing undue emphasis or credibility on the material sent back with the jury and de-emphasizing or discrediting other items not in the room with the jury." ***Commonwealth v. Creary***, 201 A.3d 749, 753 (Pa. Super. 2018).
>
> When considering materials that are not expressly prohibited under section 646(C), the question of "[w]hether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." ***Commonwealth v. Barnett***, 50 A.3d 176, 194 (Pa. Super. 2012). This decision "cannot be overturned absent an abuse of discretion." ***Id. See also Commonwealth v. Lane***, 424 A.2d 1325, 1328 (Pa. 1981) (trial court will not be found to have abused its discretion unless record discloses judgment exercised is manifestly unreasonable, or result of partiality, prejudice, bias, or ill-will).

***Commonwealth v. Wallace***, 244 A.3d 1261, 1272 (Pa. Super. 2021) (parallel citations and emphasis omitted).

In this instance, the jury made various requests during deliberations. First, the jury requested photographs that were admitted into evidence of the scene of the murder, as well as those taken from Constance Kralick's window. Neither the Commonwealth nor the defense objected to the order allowing the jury to view such evidence. Second, the jury asked to listen to Coleman's tape-recorded interview with the police, which was admitted into evidence, as well as the transcripts of the interview, which were provided to the jury to "follow along" with the interview. N.T. Trial, 6/10/22, at 73. The

- 21 -

Commonwealth objected to providing the jury with such information, while the

defense did not. The exchange proceeded as follows.

> [Commonwealth]: Your Honor, as it relates – I [am] going to jump to the transcripts first, if you do [not] mind. As it relates to the transcript, I think it was the Commonwealth's understanding all along that the transcript was prepared to aid the jury in understanding the interview as it was being played as the [court] and of course counsel knows in the previous trial in this matter, the jurors expressed post-trial that they had real difficulty understanding what was in that. So creating the transcript . . . allow[ed the jury] to follow along. Having said that, it was prepared for that purpose only. I believe, Your Honor, you, specifically told them that was [not] the evidence, that [it] was simply to aid in their understanding of the evidence. The evidence was the taped conversation.

> So speaking to that, the Commonwealth's objection remains as it relates that, that would be – frankly, it would be like asking another witness to come in and repeat their testimony. So it gives the possibility of it getting more influence or less. That jury only wanting to listen to a portion of it, again, not the whole thing, I do [not] believe it [is] appropriate in this circumstance to turn over either of those things to the jury. It [is] their recollection that controls.

> ***

> [Defense counsel]: Your Honor, it [is] clear that this case is going to hinge on the credibility of Daekwon Coleman. These tape-recorded statements while somewhat mumbled and there is some overtalking, he [is] not speaking a foreign language. I do believe that the jurors, if listening to that tape recorded statement, would be able to understand it in the absence of the transcript.

> The [c]ourt gave an instruction on prior inconsistent statements, I believe, that it would aid the jury in their deliberations. Clearly they [are] asking for it. I understand the practice in this county. I can tell the [c]ourt from practicing in several other counties in the Commonwealth, I [have] never admitted exhibits of a prior tape-recorded statement of a witness, when asked for, that request be rejected by the [c]ourt. So I would ask that the recording, the [audio] be

- 22 -

> provided to the jury. They clearly want it. It clearly would aid them in their deliberations.

***Id.*** at 73-75

Thereafter, the trial court made the following statement:

> [I will a]gain reference [the] section of the Pennsylvania Bench Book of Criminal Proceedings, Third Edition, which says this is in the discretion of the [c]ourt, and I would note under [S]ection 96.02, it says: In part, the Supreme Court has suggested that the practice of allowing written and tape-recorded statements to go with the jury should not be followed and they cite three cases[,] ***Commonwealth v. Hall***, 565 A.2d 144 [Pa. 1989]; ***Commonwealth v. Riggins***, 386 A.2d 520 [Pa. 1978], and ***Commonwealth v. Baker***, 353 A.2d 406 [Pa. 1976]. However, there [is] another reference that a trial court's decision to allow the jury to listen to an audio tape of the victim['s] trial testimony during deliberations did not constitute a violation of the expressed language of Pennsylvania Rule of Criminal Procedure 646[(C)(1)], forbidding sending out any portion of the transcript with the jury citing ***Commonwealth v. Williams***[,] 959 A.2d 1272 [Pa. 2008].
>
> Based upon my reading of these sections, first of all, I agree with the Commonwealth when I permitted [the] defense to give the jurors a copy of the transcript of [] Coleman's interview by the police. I cautioned them that they should view this the same way they viewed their notes that they took and . . . specifically that their notes are not evidence, that it was an aid, and should not have been considered evidence. I also in listening to the tape and having the transcript in front of me noted that[,] although it was done by an official court reporter, it was [not] totally verbatim. There were words missing, not in my opinion, that those words changed what the witness [] Coleman was saying[, it just] was [not one hundred percent] accurate.
>
> However, my view is that it should not go out under these rules and I will not send either the transcript or the [audio] to the jurors and I [will] note an exception by [defense counsel] to my ruling.

***Id.*** at 75-76 (emphasis added).

The trial court did not abuse its discretion in denying the jury's request to listen to Coleman's tape-recorded interview with police. Indeed, there is no evidence of record that the court's decision was "manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality." ***Commonwealth v. Bricker***, 581 A.2d 147, 156 (Pa. 1990). To the contrary, it appears that the court simply sought to ensure the jury's determination of Coleman's credibility was based upon nothing more than their perception of his tape-recorded interview with police as presented during trial. ***Id.*** at 155 (stating that it was "beyond question that permitting the prosecution to send [plea agreements] out with the jury during deliberations impermissibly bolstered [the witnesses] credibility" which, in turn, violated the defendant's right to a fair trial). As such, no relief is due.

In his sixth issue, Appellant argues that the trial court erred in permitting the Commonwealth to introduce "the conclusions found by forensic scientists as to the gunshot residue [], DNA, fingerprint and serology tests performed" through Detective Britton, as opposed to individuals who conducted said tests or authored the various reports. Appellant's Brief at 46. Appellant claims that, in so doing, the trial court permitted Detective Britton, a lay witness, to introduce "scientific evidence" in "direct violation of Appellant's constitutional rights." ***Id***. at 47.

We initially highlight the following undisputed facts to provide background to Appellant's claim. First, during Detective Britton's testimony, the Commonwealth asked him about the multiple expert reports, including a

gunshot analysis report, a trace evidence report, two serology reports, a DNA analysis report, and a latent fingerprint report. Second, in response to the Commonwealth's questions, Detective Britton read the conclusions of each of the aforementioned reports to the jury, even though he was not the author of said reports or proffered as an expert in such matters. *See* N.T. Trial, 6/8/23, at 16-26. Third, the trial court admitted the following into evidence following testimony by Detective Britton: (1) the two serology reports (Commonwealth's Exhibits 23 and 24); (2) the DNA analysis report (Commonwealth's Exhibit 25); and (3) the latent fingerprint report (Commonwealth's Exhibit 26). *See id.* at 38.

The trial court herein addressed Appellant's claim of error in its 1925(a) opinion. In so doing, the trial court admitted that "on the first day of trial, Detective Britton read the conclusions of reports such as gunshot residue analysis, serology, DNA analysis, and latent fingerprints." Trial Court Opinion, 3/29/23, at 12. The trial court, however, reasoned that Appellant's Sixth Amendment right of confrontation was not violated because Detective Britton did not read the "opinion[s] of [the various] expert[s]" to "establish the factual or evidentiary basis for those reports." *Id.* at 13. Instead, Detective Britton read from the expert reports to "illuminate [to] the jury as to how [he] proceeded in the investigation, and why he took the steps he did." *Id.* Hence, per the trial court, the expert reports were admitted for "a purpose other than establishing the truth of the matter asserted," namely, the investigative

officer's "course of conduct." ***Commonwealth v. Dargan***, 897 A.2d 496, 500 (Pa. Super. 2006).

Whether Appellant's confrontation rights were violated is a pure question of law; therefore, our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Yohe***, 79 A.3d 520, 530 (Pa. 2013), *cert. denied*, 572 U.S. 1135 (2014).[6]

This Court recently stated:

> The Confrontation Clause applies to witnesses against the accused — in other words — those who bear testimony. ***See Crawford v. Washington***, 541 U.S. 36, 54 (2004) (defining testimonial statements as, *inter alia*, "*ex parte* in-court testimony or its functional equivalent"). The focus of the Confrontation Clause is testimonial hearsay. ***Crawford***, 541 U.S. at 51-52. The ***Crawford*** Court made clear that the use of testimonial statements is not barred by the Confrontation Clause "for purposes other than establishing the truth of the matter asserted." ***Id.*** In fact, this Court has long-recognized: "A statement admitted for a purpose other than establishing the truth of the matter asserted — such as, in this case, the investigating officers' course of conduct — does not violate the Confrontation Clause." [] ***Dargan***, 897 A.2d [at] 500[.]

***Commonwealth v. Agnew***, 299 A.3d 1001, 1007 (Pa. Super. 2023) (parallel citations omitted).

In ***Commonwealth v. Brown***, 185 A.3d 316 (Pa. 2018), our Supreme Court provided an overview of the United States Supreme Court's and

---

[6] Although the admission of expert testimony is subject to an abuse of discretion standard of review, ***Commonwealth v. Watson***, 945 A.2d 174, 176 (Pa. Super. 2008) (citation omitted), an error of law constitutes an abuse of discretion. ***Nat'l Cas. Co. v. Kinney***, 90 A.3d 747, 753 (Pa. Super. 2014) (citation omitted). Thus, we ultimately employ a *de novo* standard of review.

Pennsylvania court's application of the Confrontation Clause in cases "in which the challenged statements or affidavits took the form of scientific or forensic reports or certificates." *Id.* at 325. It stated:

> In *Melendez–Diaz [v. Massachusetts*], the Court considered a Massachusetts trial court's admission into evidence at a criminal trial for drug trafficking of certificates reporting the forensic analysis of the composition and quantity of substances seized from the defendant. 557 U.S. 305 (2009). As required by Massachusetts law, the certificates were sworn to before a notary public and were offered into evidence at trial as p*rima facie* evidence the substance seized was a specific quantity of cocaine. *Id.* at 308. The defendant objected on the basis of *Crawford*, claiming the analyst who prepared the certificates was required to testify if the certificates were to be admitted into evidence. The objection was overruled, the defendant was convicted of cocaine distribution and his conviction was upheld on appeal. The High Court granted *certiorari* to determine whether the defendant's Sixth Amendment rights had been violated.
>
> The Court held "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,' " and thus were "testimonial" in nature. *Id.* at 310–[3]11, *quoting Davis[ v. Washington*,], 547 U.S. [822,] 830 [(2006)]. Moreover, the Court held admission of the certificates of analysis without the author's live testimony violated the Confrontation Clause because the certificates fell into the "core class of testimonial statements" identified in *Crawford*. *Melendez–Diaz*, 557 U.S. at 310. Significantly, the certificates of analysis were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" and under Massachusetts law, the "sole purpose" of the certificates was to provide evidence about the composition and quantity of the analyzed substance. *Id.* at 311, *quoting Crawford*, 541 U.S. at 52.
>
> The Court rejected the state's argument the certificates were admissible without supporting testimony because they simply reflected "the resul[t] of neutral, scientific testing"; the Court held this argument was "little more than an invitation to return

to our overruled decision in **Roberts**, which held that evidence with 'particularized guarantees of trustworthiness' was admissible notwithstanding the Confrontation Clause." **Melendez–Diaz**, 557 U.S. at 317, *quoting* **Ohio v. Roberts**, 448 U.S. [56,] 66 [(1980)]. The Court reiterated, "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination[.]" **Id.**, *quoting* **Crawford**, 541 U.S. at 61-62.

In **Bullcoming[ v. New Mexico**, 564 U.S. 647 (2011)], decided two years after **Melendez–Diaz**, the High Court reviewed the admissibility of a [blood alcohol content ("BAC")] report authored and signed by a non-testifying analyst. The report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author, namely, that the defendant had a BAC level of 0.21, which was the central question at the defendant's trial, and was dispositive of his guilt. The report was introduced through the testimony of a surrogate analyst. The New Mexico Supreme Court held the surrogate's testimony was adequate to satisfy the requirements of the Confrontation Clause. The issue before the High Court was "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." **Bullcoming**, 564 U.S. at 652. The High Court ruled the Confrontation Clause precludes such practice, holding "the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." **Id.** at 662. [**See also Commonwealth v. Bartin–Martin**, 5 A.3d 363 (Pa. Super. 2010), *appeal denied*, 30 A.3d 486 (Pa. 2011) (same)].

\*\*\*

Shortly after **Bullcoming**, the High Court decided **Williams v. Illinois**, [567 U.S. 50 (2012)] a divided opinion in which the Court sought to further refine its articulation of the primary purpose test under the alternate factual scenario envisioned

- 28 -

only hypothetically in **Bullcoming** by Justice Sotomayor. **Williams** involved a rape prosecution in which an expert testified she obtained a DNA profile report from an independent lab based on a semen specimen taken from a vaginal swab of the victim. The lab report was not introduced into evidence. The expert testified she compared the DNA profile contained in the lab report to the defendant's recorded DNA profile and concluded it was a match. The defendant challenged the expert's testimony which relied upon the lab report on the basis the report's admission without testimony from its author violated the Confrontation Clause.

The plurality opinion, authored by Justice Alito, joined by Chief Justice Roberts, Justice Kennedy and Justice Breyer, relied in part on F.R.E. 703 and held, "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." **Williams**, 567 U.S. at 58. Alternatively, the plurality applied the primary purpose test to conclude the underlying lab report was itself non-testimonial, and thus beyond the reach of the Confrontation Clause, because the report did not identify the defendant, was not inherently inculpatory, and was created "before any suspect was identified." **Id.** The plurality opined the "report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach." **Id.** The report "was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." **Id.** The plurality thus opined the lab report differed from the certificates of analysis and BAC reports in **Melendez–Diaz** and **Bullcoming**, which were created for the sole purpose of providing evidence against a particular defendant and were used to establish the truth of the matter asserted. The plurality concluded the defendant's Sixth Amendment confrontation right was not violated and explained:

> This conclusion is entirely consistent with **Bullcoming** and **Melendez–Diaz**. In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in **Bullcoming** that the defendant's [BAC] exceeded the legal limit and in **Melendez–Diaz**

> that the substance in question contained cocaine. Nothing comparable happened here.

*Id.* at 79.

***

Turning to our own jurisprudence, this Court addressed whether the admission of a toxicology report in a DUI case violated the defendant's rights under the Confrontation Clause in *Yohe*. The defendant's blood sample was tested three times by several analysts from one lab using two different methods, as per routine lab practice. Dr. Blum, a toxicologist, and the assistant lab director responsible for the lab's quality assurance controls, received the raw data from the analysts who performed the tests, reviewed the demographic information, verified the appropriate tests were conducted, evaluated the chain of custody, and compared the individual test results to arrive at a BAC result which he set forth in a toxicology report summarizing the test results. *Yohe*, 79 A.3d at 523–[5]24. Dr. Blum signed the report electronically, certifying its content and his own participatory role in reviewing the data and ensuring its accuracy. *Id.* at 524. At Yohe's trial, the report showing his BAC to be .159 was admitted into evidence through Dr. Blum's expert testimony. Yohe objected to the admission of the report and to Dr. Blum's testimony on the basis they violated his right to confrontation because the specific lab technicians who actually performed the tests did not testify. The objections were overruled, and Yohe was convicted of DUI and sentenced. On post-sentence motions, however, the trial court held the toxicology report was a testimonial statement requiring production at trial of the analysts who actually performed the underlying tests so that the defendant could confront them. *Id.* at 525–[5]26. The Commonwealth appealed to the Superior Court, arguing Dr. Blum was in fact the analyst who derived the actual BAC result from his comparison of the readings of the underlying tests conducted under differing methods. The Superior Court agreed Dr. Blum (rather than the original lab technicians) was the witness the defendant had a right to confront, and reversed the grant of a new trial.

On appeal, this Court analyzed the relevant precedent from the High Court, viewing "with caution" the "fragmented" decision in *Williams* where there was no single rationale to explain the result which garnered a majority. [*Yohe*,] 79 A.3d at 536. …

- 30 -

[Ultimately,] this Court considered whether Dr. Blum's toxicology report was testimonial by comparing it to "the facts of the testimonial statements considered in **Melendez–Diaz** and **Bullcoming**[,]" *id.* at 537, and easily concluded the toxicology report was testimonial. **Id.** The Court then considered whether Dr. Blum was the appropriate analyst to appear at trial for purposes of protecting Yohe's rights under the Confrontation Clause. The Court noted Dr. Blum had extensive supervisory involvement in utilizing the information supplied by his subordinates and highlighted his unique role as the only individual who engaged in the critical comparative analysis of the results of the various tests performed to determine the defendant's actual BAC. **Id.** at 540. The Court surmised the facts distinguished the case from **Bullcoming** where the surrogate witness had no opinion concerning the defendant's BAC, "[r]ather the testifying witness merely read the analyst's report into evidence and offered no independent opinion about the defendant's [BAC]." **Id.** at 541, *citing* **Bullcoming**, 564 U.S. at 662. Thus, the **Yohe** Court determined the defendant's rights under the Confrontation Clause were not violated because the "author" of the toxicology report was the analyst who testified at trial and was available for cross-examination. **Id.**

**Id**. at 325–329 (parallel citations omitted).

In **Brown**, **supra**, our Supreme Court addressed whether the admission of an autopsy report violated the defendant's rights under the Confrontation Clause when the report's author did not appear as a witness during trial. In that case, Darnell Brown was charged with, *inter alia*, murder, following the shooting death of the victim, Cory Morton. Importantly, following Morton's death, Dr. Marion Osbourne of the Philadelphia Medical Examiner's Officer performed an autopsy and prepared a report detailing his findings. By the time of Brown's trial, however, Dr. Osbourne "was no longer employed by the Medical Examiner's Officer" and, as such, "he was not called as a witness."

*Id.* at 318. Instead, over defense counsel's objection, Dr. Osburne's "report of the victim's autopsy was admitted into evidence" and, the Commonwealth called Dr. Albert Chu of the Philadelphia Medical Examiner's Officer, "who had not been present at the autopsy, to provide expert testimony based on the portions of the autopsy report as well as autopsy photographs." *Id.* at 318-319. After a jury convicted Brown of third-degree murder, as well as other offenses, he appealed, "arguing the trial court erred by permitting Dr. Chu to testify about the victim's cause and manner of death based on Dr. Osbourne's autopsy report." *Id.* at 320.

On appeal, the Supreme Court first considered "whether the challenged autopsy report . . . was testimonial in nature such that Brown's Sixth Amendment right to confront the witness against him was violated by its admission as trial." *Id.* at 329. The Court noted that, in Pennsylvania, autopsy reports are required "in all cases of sudden, violent, and suspicious deaths, or deaths by other than natural causes" to "determine whether the death occurred as the result of a criminal act." *Id.* It further noted that the coroner or medical examiner authoring the report must "consult and advise the local district attorney to the extent practicable." *Id.* Based upon the foregoing, the Court concluded that the autopsy "in this case was testimonial." *Id.* The Court further concluded that, "under the *Crawford*, *Melendez-Diaz*, *Bullcoming* and *Yohe* precedents, the report could properly be introduced into evidence without Dr. Osbourne's accompanying testimony only if Dr. Osbourne was unavailable and Brown 'had a prior opportunity to

cross-examine' him." ***Id.*** (citation omitted). Because Brown did not have such an opportunity, the Court summarily concluded that "the admission of Dr. Osbourne's report into evidence at Brown's trial was error." ***Id.*** The Court, however, went on to analyze and determine that the trial court's error was "harmless" because the "autopsy report was merely cumulative of Dr. Chu's independent opinion regarding the cause of death which was properly admissible." ***Id.*** at 330.

We are troubled by the circumstances of this case, as well as the trial court's reasoning. It is important to note that, not only did Detective Britton read, verbatim, the conclusions of multiple expert reports, the trial court also admitted four of the expert reports (two serology reports, the DNA analysis report, and the latent fingerprint report) into evidence following Detective Britton's testimony, even though he did not author said reports. To the contrary, Tina R. Smith of the Pennsylvania State Police Bureau of Forensic Services Greensburg Laboratory authored both serology reports (Commonwealth's Exhibits 23 and 24); Timony Gavel of the Pennsylvania State Police Bureau of Forensic Services Greensburg Laboratory authored the DNA analysis report (Commonwealth's Exhibit 25); and Randy J. Mocello of the Pennsylvania State Police Bureau of Forensic Services Greensburg Laboratory authored the latent fingerprint report (Commonwealth's Exhibit 26). It is almost beyond question that each of the respective expert reports fall "into the 'core class of testimonial statements'" because they were "made under circumstances which would lead an objective witness reasonably to

believe that the statement would be available for use during at a later trial" and were "functionally identical to live, in-court testimony." **Brown**, 185 A.3d at 325 (citation omitted). Hence, under **Crawford**, **Melendez-Diaz**, **Bullcoming**, **Yohe**, and **Brown**, the expert reports could only be introduced into evidence without the accompanying testimony of Tina R. Smith, Timothy Gavel, and Randy J. Mocello if they were unavailable and Appellant had a prior opportunity to cross-examine them. There is no indication that any of the aforementioned individuals were unavailable or that Appellant previously cross-examined them. Hence, the admission of the serology reports, the DNA analysis report, and the latent fingerprint report during Detective Britton's testimony appears to be an error.

We note that, in justifying its decision, the trial court found that the experts' conclusions, as relayed by Detective Britton, were not offered for the truth of the matter asserted, but to explain the officer's "course of conduct." **Dargan**, 897 A.2d at 500. In our view, the trial court's rationale stretches the course of conduct jurisprudence beyond its reach. For example, Detective Britton did not simply relay the substance of the reports to explain the course of his investigation, he offered verbatim recitation of the reports and, ultimately, the trial court admitted the reports without testimony from their specific authors. The trial court, therefore, failed to recognize that, unlike previous case law, Detective Britton's testimony involved express review of each conclusion prepared by highly qualified individuals – experts - not, for example, information provided by a confidential informant. **See Agnew**, 299

A.3d at 1007-1008 (holding that the Commonwealth presented text message between the confidential informant and the appellant "to explain [an investigator's] course of conduct" and, as such, "the texts were admitted, not for their truth" and the appellant's "claim of a Confrontation Clause violation [] merit[ed] no relief"); **see also Dargan**, 897 A.2d at 499-502 (same). Hence, a level of reliability, formality and expertise accompanied Detective Britton's testimony due to its very subject matter. Moreover, the trial court completely ignored the fact that the various reports, prepared by different experts, were admitted into evidence following the testimony of Detective Britton, a lay witness, who could not be cross-examined about the contents of the documents, a key procedural safeguard guaranteed by the Confrontation Clause.

Notwithstanding the foregoing, we are constrained to conclude that Appellant is not entitled to relief because he failed to raise an objection to Detective Britton's testimony at trial. Indeed, a detailed review of the certified record reveals the following.

On the first day of Appellant's trial, Detective Britton testified in the morning and was recalled in the afternoon. During his redirect examination, Detective Britton initially explained that, on the night of the murder, officers arrested Colemen "approximately six blocks away" from the crime scene, wearing a red sweatshirt, with a firearm. N.T. Trial, 6/8/23, at 12. The officers then took Coleman in for questioning and proceeded to investigate Coleman's potential involvement. To do so, Detective Britton testified that "a

gunshot residue kit was performed on [] Coleman's hands." *Id.* at 13-14.

Then, Detective Britton was provided with a trace evidence report

(Commonwealth's Exhibit 22), issued from the Pennsylvania State Police

Bureau of Forensic Services in Harrisburg, Pennsylvania, and authored by

Albert T. Lattanzi, Jr. *Id.* at 16. Upon questioning, Detective Britton read the

"result or [] conclusion of [the] report to the jury." *Id.* At that time, defense

counsel objected, stating:

> Your Honor, I can [not] cross-examine this witness on this
> information if this witness' position is he believed based on his
> investigation that –
>
> [] I would [not] be able to specifically reference [] that
> conclusion because he is not an expert. He can say based on
> my investigation I believe A, B, and C so I did X, Y, and Z, but
> for him to specifically reference an expert report when he [is]
> not an expert, I can [not] cross-examine him based on those
> findings because he is not an expert.

*Id.* at 17-18. After a brief discussion, counsel withdrew his objection and

stated that "[a]s long as [it is] made clear through the questioning that

[Detective Britton] is not an expert and this was [not] his conclusion . . . I

[am] fine with it." *Id.* at 18. Thereafter, Detective Britton's examination

continued wherein he read into evidence the conclusions of the two serology

reports, the DNA analysis report, and the latent fingerprint report. *See id.* at

20-24. Appellant's counsel did not object to any of the questions raised

regarding these expert reports, nor did he object when Detective Britton read

the conclusions of these expert reports.

Finally, Detective Britton was asked about a report authored by Gesuele Burello, a corporal with the firearm and tool mark division of the Greensburg Regional Crime Lab. More specifically, the Commonwealth asked Detective Britton the following question: "Detective, in your experience[,] is it unusual to not have a DNA result or a fingerprint result from a lab analysis?" *Id.* at 25. At that time, defense counsel objected saying that the question "[c]all[ed] for testimony from an expert." *Id.* A side bar conversation was held and defense counsel again stated that his "standing objection [was] that [the answer to the Commonwealth's question] require[d] expert testimony." *Id.* at 27. The court then instructed the Commonwealth to rephrase the question. *Id.* The Commonwealth obliged and no subsequent objection was raised. *Id.* Later, the trial court admitted the two serology reports (Commonwealth's Exhibits 23 and 24), the DNA analysis report (Commonwealth's Exhibit 25) and the latent fingerprint report (Commonwealth's Exhibit 26) into evidence.

It is apparent, therefore, that Appellant's counsel only objected twice during Detective Britton's testimony. In particular, counsel objected when Detective Britton read the conclusion of the trace evidence report. Counsel, however, ultimately withdrew this objection and proceeded to allow Detective Britton to read the conclusions of the serology reports, the DNA analysis report, and the latent fingerprint report. Then, Appellant's counsel lodged another objection during Detective Britton's discussion of the firearm and tool mark report, but only on the basis that the question posed called for an expert opinion. At no time did Appellant's counsel raise a specific objection rooted in

a claim that Detective Britton's testimony regarding the various conclusions of the forensic or scientific reports violated his constitutional rights, *i.e.*, the Confrontation Clause of the Sixth Amendment of the United States' Constitution. Appellant's counsel also did not object to the trial court's admission of the two serology reports, the DNA analysis report, or the latent fingerprint report into evidence. *See* N.T. Trial, 6/8/23, at 38.[7] Appellant admitted as such in his post-sentence motion. *See* Appellant's Amended Post-Sentence Motions *Nunc Pro Tunc*, 11/23/22, at 3 (arguing that trial counsel was "ineffective for failing to lodge a continuing objection to Detective Britton being permitted to testify regarding the conclusions of the forensic evidence when he was not qualified as an expert in the field of forensics"). Accordingly, this issue is waived. *See Commonwealth v. Konias*, 136 A.3d 1014, 1021-1022 (Pa. Super. 2016) ("'In order to preserve an issue for review, a party must make a timely and specific objection at trial.' Moreover, '[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made.'") (citations omitted); *Commonwealth v. Houck*, 102 A.3d 443, 451 (Pa. Super. 2014) ("[T]he failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue.").

_____

[7] We note that the Commonwealth did not introduce into evidence the trace evidence report (Commonwealth's Exhibit 22) or the firearm and tool mark report during Detective Britton's testimony (Commonwealth's Exhibit 27). Instead, the Commonwealth presented the expert testimony of the authors of both reports the next day and, during their expert testimony, introduced their reports into evidence. *See* N.T. Trial, 6/9/23, at 4-45.

In his seventh issue, Appellant claims that the trial court committed an error of law by failing to issue a limiting instruction after Detective Britton "made various statements during his testimony" discussing "the credibility of the Commonwealth's [] witness, Daekwon Coleman." Appellant's Brief at 48. Appellant, however, failed to request a limiting instruction following Detective Britton's testimony regarding Coleman's credibility. Appellant admitted to this failure in his post-sentence motion. *See* Appellant's Amended Post-Sentence Motions *Nunc Pro Tunc*, 11/23/22, at 3-4 (arguing that trial counsel was ineffective for failing to request a limiting/curative instruction and/or mistrial when Detective Britton testified about the witness Coleman's credibility after said statements were entered on the record during trial). As such, this issue is waived. *See Commonwealth v. Bryant*, 855 A.2d 726, 739 (Pa. 2004) ("Failure to request a cautionary instruction upon the introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction.").

In his eighth issue, Appellant argues that the trial court erroneously failed to issue a "No Adverse Inference Charge" to the jury at the close of trial after Appellant "did not testify or call any witness" and, as such, "did not provide a defense to the charges for which he was on trial." Appellant's Brief at 53. A review of the record, however, reveals that Appellant did not raise an objection to the trial court's jury instructions, which Appellant admitted in his post-sentence motion. *See* Appellant's Amended Post-Sentence Motions *Nunc Pro Tunc*, 11/23/22, at 4-5 (arguing that trial counsel "was ineffective

for failing to request a No Adverse Inference Jury Instruction in violation of [Appellant's] constitutional rights"). As such, this claim is also waived. *See Commonwealth v. Shamsud—Din*, 995 A.2d 1224, 1226 (Pa. Super. 2010) (reiterating that failure to object to a jury instruction constitutes waiver of a challenge to an error in the instruction).

In his final issue, Appellant claims that the trial court committed an error of law by "fail[ing] to conduct a colloquy with Appellant . . . regarding his decision on whether to testify or call character witnesses." Appellant's Brief at 54. Appellant, however, neither objected to the trial court's failure nor requested the trial court to engage in an on-the-record colloquy. Appellant admitted to this failure in his post-sentence motion. *See* Appellant's Amended Post-Sentence Motions *Nunc Pro Tunc*, 11/23/22, at 5 (arguing that trial counsel "was ineffective for failing to request the [t]rial [c]ourt [to] conduct a colloquy with [Appellant] regarding his decision to testify and call a character witnesses"). Thus, this issue is waived. *See Commonwealth v. Duffy*, 832 A.2d 1132, 1137 (Pa. Super. 2003) (holding that because the appellant did not object to the trial court's failure to conduct a on-the-record colloquy regarding the appellant's waiver of his right to testify, his claim of error was waived on appeal).

Because Appellant's first five claims lack merit, and because issues six through nine were not properly preserved before the trial court, Appellant is not entitled to relief in this direct appeal. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge King joins.

Judge Lane files a Concurring Memorandum which Judge King joins.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/18/2024